UNITED STATES of America,
Plaintiff–Appellee,

v.

John A. VOSS, Defendant–Appellant.

UNITED STATES of America,
Plaintiff–Appellee,

v.

Mitchell S. BEALS, Defendant–Appellant.

UNITED STATES of America,
Plaintiff–Appellee,

v.

Brent L. BEALS, Defendant–Appellant.

Nos. 94–1320 to 94–1322.

United States Court of Appeals,
Tenth Circuit.

May 2, 1996.

Rehearing Denied June 28, 1996.

William A. Cohan, Encinitas, California, for Defendant–Appellant John A. Voss and Defendant–Appellant Brent L. Beals.

Warren R. Williamson, Assistant Federal Public Defender (Michael G. Katz, Federal Public Defender, with him on the briefs), Denver, Colorado, for Defendant–Appellant Mitchell Beals.

James C. Murphy, Assistant U.S. Attorney (Henry L. Solano, U.S. Attorney with him on the briefs), Denver, Colorado, for Plaintiff–Appellee U.S.

Before TACHA, BRORBY, and HENRY, Circuit Judges.

HENRY, Circuit Judge.

The defendants John A. Voss, Mitchell S. Beals, and Brent L. Beals appeal their jury convictions and sentences for criminal contempt under 18 U.S.C. § 401(3). They argue that the evidence presented at trial was insufficient to support their convictions, that the district court applied the wrong provision of the United States Sentencing Guidelines when calculating their sentences, and that the court improperly increased their offense levels for substantial interference with the administration of justice. Additionally, John Voss and Brent Beals argue that the district court erred by refusing to submit a number of their proposed instructions to the jury. We have jurisdiction pursuant to 28 U.S.C. § 1291, and we affirm the district court's judgment in all respects.

## I. BACKGROUND

The defendants are members of a group called the National Commodity and Barter Association (NCBA). The defendants describe the NCBA as "a political/educational association espousing dissident views regarding the federal reserve and the income tax systems and advocat[ing] the return to currency backed by gold and/or silver." Br. of Aplts. John Voss and Brent Beals at 4. Between 1985 and 1990, the NCBA operated the National Commodities Exchange (NCE), which was a private banking operation that provided financial services to NCBA members.

John Voss testified at trial that he has been the director of the NCBA since 1986. Mitchell Beals testified that he had headed

the NCE from late 1985 to mid–1988, and that his brother, Brent Beals, had operated the NCE from mid–1988 until the NCE closed in 1990. Mitchell Beals also testified that he created the Mutual Assistance Plan (MAP) in 1984. The MAP is a legal defense fund supported wholly from NCBA member contributions. Mitchell Beals testified at trial that he had invited Brent Beals to take over the operations of the NCE in 1988 so that he could "turn [his] focus back" to running the MAP program. Rec. vol. XII at 1407.

In July of 1990, a federal grand jury that had been investigating the NCBA and the NCE issued two subpoenas requiring production of the business and financial records of the organizations: the first was addressed to "Custodian of Records" for the NCBA; *see* Aplee. Addendum doc. 1; the second was addressed to "Custodian of Records" for the NCE; *see id.* doc. 2. Both subpoenas specifically included "[d]ocuments relating to the Mutual Assistance Program." *Id.* doc. 1 attach., doc. 2 attach. The subpoenas were served upon an attorney for the two organizations.

The NCBA and the NCE thereafter filed a petition to quash the subpoenas. The district court held a hearing on the petition, and the district court's minutes reflect that John Voss and Mitchell Beals appeared on behalf of the petitioners.[1] The district court denied the petition and entered an order stating that the "petitioners are DIRECTED to comply with [the] subpoenas ... forthwith." Aplt. Brent Beals's Addendum at 4. The organizations then moved the court to stay compliance with the subpoenas pending the resolution of their appeal. The district court denied the motion to stay and entered a second order, this time directing the organizations to comply with the subpoenas by December 10, 1990. *See id.* at 6–7. Both organizations refused to comply.

In April of 1991, the district court held the organizations in civil contempt and imposed a fine of fifty dollars for each day of noncompli-

ance with the court's order. Both the contempt citation and the fine were affirmed by this court on appeal, *see National Commodity & Barter Ass'n v. United States,* 972 F.2d 356 (10th Cir.1992), and the Supreme Court denied certiorari, *see* 507 U.S. 972, 113 S.Ct. 1413, 122 L.Ed.2d 784 (1993).

In 1993, two new subpoenas were issued by a new grand jury. These were also addressed to the "Custodian of Records" for each organization, but this time they were personally served upon Mr. Voss. *See* Aplee. Addendum doc. 9, doc. 10. The district court subsequently entered another order directing the NCBA and the NCE to comply with the subpoenas. The organizations still failed to comply.

The grand jury thereafter returned indictments against the defendants for criminal contempt in violation of 18 U.S.C. § 401(3), for conspiring to defraud the United States government by impairing and impeding the Internal Revenue Service (IRS) in its duties in violation of 18 U.S.C. § 371, and for structuring financial transactions to evade currency transaction reporting requirements in violation of 31 U.S.C. §§ 5322(a), 5324(3) and 18 U.S.C. § 2. After a jury trial, the defendants were acquitted on all but the criminal contempt charges. The defendants then moved for judgments of acquittal, arguing that the evidence was insufficient to support the jury's verdict on the contempt charges. These motions were denied. The defendants were ultimately sentenced to terms ranging from twelve to twenty-four months' imprisonment. They now appeal.

## II. DISCUSSION

### A. Sufficiency of the Evidence

■ The defendants first argue that the evidence presented at trial was insufficient to support their contempt convictions. In making this argument, the defendants are faced with a high hurdle: in reviewing the sufficiency of the evidence to support a jury verdict, this court must review the record de

---

1. Although Mitchell Beals concedes that he attended the hearing, he argues that he did not appear on behalf of the petitioners. However, the district court minutes read as follows: "Introduction of counsel and parties: Paul Carter, John Voss, John Pleasant and Mitchell Beals for petitioner/plaintiff." Aplt. Brent Beals's Addendum at 10.

novo "and ask only whether, taking the evidence—'both direct and circumstantial, together with the reasonable inferences to be drawn therefrom'—in the light most favorable to the government, a reasonable jury could find the defendant guilty beyond a reasonable doubt." *United States v. Urena,* 27 F.3d 1487, 1489 (10th Cir.) (quoting *United States v. Hooks,* 780 F.2d 1526, 1531 (10th Cir.), *cert. denied,* 475 U.S. 1128, 106 S.Ct. 1657, 90 L.Ed.2d 199 (1986)), *cert. denied,* —— U.S. ——, 115 S.Ct. 455, 130 L.Ed.2d 364 (1994).

■ Federal courts are authorized by statute to punish contempt: "A court of the United States shall have power to punish by fine or imprisonment, at its discretion, such contempt of its authority and none other, as ... [d]isobedience or resistance to its lawful writ, process, order, rule, decree, or command." 18 U.S.C. § 401(3). The defendants contend that under this statute, a court's order must be sufficiently specific to put the defendants on notice that they are personally required to comply. They maintain that the evidence at trial failed to show that the district court's order in this case was adequate to put them on notice that they were personally required to produce the subpoenaed documents on behalf of the NCBA and the NCE.

### 1. Notice to Individual Defendants

Although this circuit has not dispositively addressed this issue, several other circuits have recognized a notice requirement under § 401(3). Almost all of those circuits have agreed that one may be held in contempt only if the court's order is sufficiently specific so as to put the alleged contemnor on notice. *See, e.g., Hazen v. Reagen,* 16 F.3d 921, 924 (8th Cir.1994) ("Before a party can be held in contempt for violating a court order, he must have actual knowledge of the order and the order must be 'sufficiently specific to be enforceable.'" (quoting *Finney v. Arkansas Bd. of Correction,* 505 F.2d 194, 213 (8th Cir. 1974))); *Cooper v. Texaco, Inc.,* 961 F.2d 71, 72 n. 3 (5th Cir.1992) ("There are three elements to contempt under 18 U.S.C. § 401(3):(1) a reasonably specific order, (2) violation of the order, and (3) the willful

intent to violate the order." (citing *United States v. Burstyn,* 878 F.2d 1322, 1324 (11th Cir.1989))); *United States v. Powers,* 629 F.2d 619, 627 (9th Cir.1980) ("Criminal contempt is established when there is a clear and definite order of the court, the contemnor knows of the order, and the contemnor willfully disobeys the order."); *In re Rubin,* 378 F.2d 104, 108 (3d Cir.1967) ("[T]he alleged contemnor [must have] had knowledge of the order which he is said to have violated[,]" and the order "must be specific and definite." (citing *Wilson v. North Carolina,* 169 U.S. 586, 600, 18 S.Ct. 435, 440–41, 42 L.Ed. 865 (1898)); *Terminal R.R. Ass'n v. United States,* 266 U.S. 17, 29, 45 S.Ct. 5, 8, 69 L.Ed. 150 (1924)); *cf. Project B.A.S.I.C. v. Kemp,* 947 F.2d 11, 16 (1st Cir.1991) (noting that a court order must be "clear and unambiguous," and that any ambiguities must be construed in a light favorable to those charged with contempt).

In arguing that the subject subpoenas and court orders were sufficiently specific, the government relies primarily on *Wilson v. United States,* 221 U.S. 361, 31 S.Ct. 538, 55 L.Ed. 771 (1911); *Nilva v. United States,* 352 U.S. 385, 77 S.Ct. 431, 1 L.Ed.2d 415 (1957); and general principles regarding the responsibility of officers and agents to respond to subpoenas directed to corporate entities. In *Wilson,* the Court noted that "[a] command to the corporation is in effect a command to those who are officially responsible for the conduct of its affairs. If they, apprised of [the subpoena], prevent compliance or fail to take appropriate action within their power for the performance of the corporate duty, they, no less than the corporation itself, are guilty of disobedience and may be punished for contempt." *Wilson,* 221 U.S. at 376, 31 S.Ct. at 543. In a later case, the Court applied *Wilson*'s reasoning to the officers of an unincorporated association. *See United States v. Fleischman,* 339 U.S. 349, 358, 70 S.Ct. 739, 744, 94 L.Ed. 906 (1950) ("If the legislative committee has a right to demand the records, the directing officers of the association are quite as responsible for their production as if they were corporate officers.").

In *Nilva,* the Court applied *Wilson* to affirm a criminal contempt conviction based on

a corporate officer's disregard of a grand jury subpoena seeking corporate records. Each of the subpoenas was addressed to a corporation that was wholly owned by an associate of the contemnor, and each was served upon the secretary-treasurer of the corporation. When the owner of the corporation moved to quash the subpoenas, the district court denied the motion and "ordered the subpoenaed records to be produced 'forthwith.'" *Id.* at 388, 31 S.Ct. at 547. The contemnor thereafter appeared before the court, stated that he was the Vice President of the corporation, and produced some, but not all, of the subpoenaed documents. The trial court thereafter held him in criminal contempt for failing to produce all of the subpoenaed documents.

The Supreme Court affirmed the conviction. The Court began by stating: "it is settled that a criminal contempt is committed by one who, in response to a subpoena calling for corporation or association records, refuses to surrender them when they are in existence and within his control." *Id.* at 392, 77 S.Ct. at 435. In holding that the evidence presented at trial "reasonably support[ed] the conclusion that those records were in existence and were within petitioner's control," *id.* at 394, 77 S.Ct. at 437, the Court noted the following factors:

> Petitioner was a "nominal" vice-president of the corporation; he rendered it legal and administrative services of many kinds; he was a brother-in-law of its sole owner and president; he appeared in court as its official representative in answer to the subpoenas and represented that he had brought with him all of the subpoenaed records that he and the office force could find.

*Id.* at 393, 77 S.Ct. at 437.

As the government notes, a number of courts have applied *Wilson* and *Nilva* to conclude that officers and agents may be held in contempt when a corporation or association fails to respond to a subpoena. In many instances the finding of contempt depends upon whether the officer or agent "was somehow *personally* connected with defying the authority of the court or disobeying its lawful decrees." *See Ex parte Chambers,*

898 S.W.2d 257, 261 (Tex.1995). The required personal connection with the organization's defiance of the court may arise from the agent's general control over the organization's operations or from his or her participating or aiding and abetting in conduct circumventing the subpoena or order. *See, e.g., United States v. Laurins,* 857 F.2d 529, 535 (9th Cir.1988) (Defendant's de facto control over a corporation after the corporation received a summons supported a finding of criminal contempt), *cert. denied,* 492 U.S. 906, 109 S.Ct. 3215, 106 L.Ed.2d 565 (1989); *see also Colonial Williamsburg Found. v. Kittinger Co.,* 792 F.Supp. 1397, 1406 (E.D.Va.1992) ("[T]he case law establishes that an individual who is responsible for insuring that a corporation complies with a court order cannot escape liability merely by removing himself from the day-to-day operations of the corporation and washing his hands of responsibility."), *aff'd,* 38 F.3d 133 (4th Cir.1994); *United States v. Greyhound Corp.,* 363 F.Supp. 525, 571–73 (N.D.Ill.1973) (holding corporate officials in contempt because of their personal involvement in decision not to comply with court order), *aff'd,* 508 F.2d 529 (7th Cir.1974). However, an agent's inability to comply with a subpoena or order due to circumstances beyond his or her control may constitute a defense to a contempt charge. *See United States v. Rylander,* 714 F.2d 996, 1002–03 (9th Cir.1983), *cert. denied,* 467 U.S. 1209, 104 S.Ct. 2398, 81 L.Ed.2d 355 (1984).

■ Applying these principles, we hold that when a subpoena or order unequivocally directs an organization to produce records, the persons who have knowledge of the court's action and who "fail to take appropriate action within their power" to comply with the subpoena or order may be held in contempt. *See Wilson,* 221 U.S. at 376, 31 S.Ct. at 542–42; *cf. Fleischman,* 339 U.S. at 356, 70 S.Ct. at 743 ("When one accepts an office of joint responsibility, whether on a board of directors of a corporation, the governing board of a municipality, or any other position in which compliance with lawful orders requires joint action by a responsible body of which he is a member, he necessarily assumes an individual responsibility to act,

within the limits of his power to do so, to bring about compliance with the order.").[2]

█ Under this standard, we conclude that the evidence in the instant case—viewed in the light most favorable to the government—was sufficient to support the defendants' jury convictions for criminal contempt under § 401(3). Initially we note that Brent Beals and John Voss have acknowledged in this appeal that they had actual knowledge of the court orders. *See* Br. of Aplts. Brent Beals and John Voss at 29. Additionally, Mitchell Beals stipulated at trial that he had knowledge of the subpoenas and court orders. *See* Rec. vol. X at 868. Consequently, the remaining question regarding the defendants' challenge to the sufficiency of the evidence is whether they failed to take appropriate action within their power to comply with the subpoenas and orders.

Upon review of the record, we find sufficient evidence to support the contempt convictions of all three of the defendants. First, with regard to John Voss, his own testimony established that he has been the director of the NCBA since 1986. *See* Rec. vol. XI at 1179–80. Additionally, Mr. Voss testified that production of NCBA records was within his duties as the NCBA's director:

Q. Mr. Voss, if anyone is going to produce records on behalf of the [NCBA], it would be you, wouldn't it sir?

A. [By Mr. Voss:] As director, yes, I would be responsible for that, yes.

Q: You knew at all times that the NCBA had been instructed to turn over those, had been ordered to turn over those records, right?

A: Yes.

Q: But you refused to turn those over because you disagreed with [the district judge], and you thought he was wrong, isn't that true?

A: That's true.

*Id.* at 1226.

As to Brent Beals, we note that Mitchell Beals testified at trial that Brent Beals had taken control of the NCE's operations by 1989. *See* Rec. vol. XII at 1444. Mitchell Beals also conceded that all three defendants had access to NCE files at any time. *See* Rec. vol. XIII at 1480–81. Although Brent Beals refused to admit at trial that he had been the director of the NCE, he conceded that he did "all of the work" for the organization. Rec. vol. XIV at 1702. From the evidence of Brent Beals's control over the NCE's operations and his access to the requested records, a reasonable jury could find that he failed to take appropriate action within his power to comply with the subpoenas and orders and was therefore guilty of criminal contempt.

Finally, we are not persuaded by Mitchell Beals's argument that because he was no longer the director of the NCE when the subpoenas and court orders were issued, he did not have reasonably specific notice that he was required to comply with the subpoenas. As we have noted, the subpoenas specifically required production of "[d]ocuments relating to the Mutual Assistance Program." Aplee. Addendum doc. 1 attach., doc. 2 attach. Mitchell Beals specifically testified that he created the MAP program, Rec. vol. XII at 1401–02, and that he ran the MAP program after he left the NCE in 1988, *id.* at 1407–08. Mitchell Beals's testimony also indicates that he retained involvement in the NCE even after Brent Beals began directing it in 1988. *See, e.g.,* Rec. doc. XIII at 1490 ("We determined [in 1990] that the NCE needed to be shut down.").

We therefore conclude that the testimony of the defendants at trial provided sufficient evidence from which a jury could reasonably have found that each of them failed to take appropriate action to comply with the subpoenas and court orders and thereby violated 18 U.S.C. § 401(3). In light of the defen-

---

**2.** In the instant case, although the defendants were charged with violating 18 U.S.C. § 401(3), they were not charged with aiding and abetting the contempt violations pursuant to 18 U.S.C. § 2. We note that individuals who aid, abet, participate in, or encourage an organization's defiance of a court order or subpoena may also be charged and convicted under 18 U.S.C. § 2. *See Laurins,* 857 F.2d at 535 n. 1.

dants' admitted knowledge of the subpoenas and orders, the subpoenas addressed to the "Custodian of Records" for the organizations and the court orders directed at the two organizations were sufficiently specific to put the defendants on notice that they were personally required to comply.

### 2. Spallone and Project B.A.S.I.C.

In challenging the jury's verdict, the defendants also invoke *Spallone v. United States,* 493 U.S. 265, 110 S.Ct. 625, 107 L.Ed.2d 644 (1990) and *Project B.A.S.I.C. v. Kemp,* 947 F.2d 11 (1st Cir.1991). After careful review of both decisions, we conclude that neither of them supports the defendants' contention that their convictions are not supported by the evidence.

In *Spallone,* a district court ordered a city to disperse public housing throughout the city. The city delayed acting on the court's order and the court entered another order requiring the city to pass an ordinance. A resolution of intent to adopt the ordinance in issue was defeated by the city council by a four-to-three vote. The district court thereafter held the city and the city council members voting against the resolution in contempt.

The Supreme Court reversed the contempt charges as to the individual council members. In doing so, the Court noted that "[T]he city ... was a party to the action from the beginning.... Petitioners, the individual city council members, on the other hand, were not parties to the action...." *Id.* at 276, 110 S.Ct. at 632–33.

We believe that *Spallone* is distinguishable from the instant case. A thorough reading of the case makes it clear that the Court rested its opinion on separation of powers concerns rather than on the lack of specificity in the court order. Much of the opinion was devoted to an explanation of why policies similar to those giving legislative bodies immunity should be applied. The Court noted that the particular problem in *Spallone* was the imposition of sanctions on individual council members because of the conflict of interest that would result; specifically, imposing sanctions in that case would have put the council members in a position of having

to balance their personal interests against the city's interests that they were elected to protect. *Id.* at 279–280, 110 S.Ct. at 634–35. Such considerations are not at issue in the instant case.

Moreover, as the government persuasively argues, even if *Spallone* were applicable, the Supreme Court's reasoning supports a finding of contempt as to the individual defendants. Assessing the district court's action, Justice Rehnquist concluded that the court "should have proceeded with such contempt sanctions first against the city alone in order to secure compliance with the remedial order. Only if that approach failed to produce compliance within a reasonable time should the question of imposing contempt sanctions against petitioners even have been considered." *Id.* at 280, 110 S.Ct. at 634–35. In the instant case, as noted above, the district court first imposed civil contempt sanctions against NCBA and NCE. Only after the entities failed to comply did the government initiate contempt proceedings against the individual defendants.

The defendants' reading of *Project B.A.S.I.C.* is similarly unpersuasive. In that case, a district court held the United States Department of Housing and Urban Development (HUD) in contempt for refusing to provide funding for a local housing project, as required by a local court order. The First Circuit reversed the contempt citation against HUD on the grounds that it did not have fair notice that it was being compelled on penalty of contempt to provide funding for the project.

*Project B.A.S.I.C.* clearly stands for the proposition that "a party cannot be held in contempt unless its contumacity clearly and convincingly appears." *Project B.A.S.I.C.,* 947 F.2d at 16. Further, "the contempt power ought not to be deployed against a backdrop of uncertainty," *id.* at 17, and "any ambiguities or uncertainties in such a court order must be read in a light favorable to the person charged with contempt," *id.* at 16.

However, unlike the examples given in *Project B.A.S.I.C.,* the subpoenas and orders at issue here neither " 'def[y] comprehension,' " *id.* at 17 (quoting *International Long-*

shoremen's Ass'n, Local 1291 v. Philadelphia Marine Trade Ass'n, 389 U.S. 64, 76, 88 S.Ct. 201, 208, 19 L.Ed.2d 236 (1967)) nor were "deployed against a backdrop of uncertainty," *id.* Unlike the order in *Project B.A.S.I.C.* (which did not clearly indicate that HUD was bound by its terms), the subpoenas at issue here were clearly directed to the custodians of the records, and, contrary to their assertions, the defendants clearly knew of the court's lawful demand for the documents.

Finally, we note that *Project B.A.S.I.C.* merely holds that "as a necessary prelude to a finding of contempt, the putative contemnor should have reasonably definite advance notice that a court order applies to it." *Id.* The facts of the instant case demonstrate such reasonable advance notice. Thus, *Project B.A.S.I.C.*, like *Spallone*, does not support the defendants' challenge to their contempt convictions.

### B. Jury Instructions

■■■ John Voss and Brent Beals also argue that the district court erred by failing to submit their proffered instructions to the jury. In addressing the defendants' arguments:

> We review the district court's refusal to give a particular jury instruction for abuse of discretion. In assessing whether the court properly exercised that discretion, a reviewing court must examine the instructions as a whole to determine if they sufficiently cover the issues in the case and focus on the facts presented by the evidence. The question of whether the jury was properly instructed is a question of law, and thus, our review is de novo.

*United States v. Lee*, 54 F.3d 1534, 1536 (10th Cir.) (citation omitted), *cert. denied*, —— U.S. ——, 116 S.Ct. 247, 133 L.Ed.2d 173 (1995). We " 'consider all the jury heard and, from [the] standpoint of the jury, decide not whether the charge was faultless in every particular but whether the jury was misled in any way and whether it had understanding of the issues and its duty to determine these issues.' " *Durflinger v. Artiles*, 727 F.2d 888, 895 (10th Cir.1984) (quoting *Alloy Int'l Co. v. Hoover–NSK*

*Bearing Co.*, 635 F.2d 1222, 1226–27 (7th Cir.1980) (quoting *Borel v. Fibreboard Paper Prods. Corp.*, 493 F.2d 1076, 1100 (5th Cir. 1973), *cert. denied*, 419 U.S. 869, 95 S.Ct. 127, 42 L.Ed.2d 107 (1974))). "We will reverse a conviction due to an erroneous instruction only if the error was prejudicial when viewed in light of the entire record." *United States v. Martin*, 18 F.3d 1515, 1519 (10th Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 187, 130 L.Ed.2d 121 (1994). The defendants cite three alleged errors in the district court's instructions, and we discuss each in turn.

#### 1. Notice to the defendants

■■■ The defendants first argue that the jury instructions did not adequately direct the jury to determine whether the court order put the defendants on notice that they were personally required to comply. In that regard, the district court submitted the following instruction to the jury:

> To establish the alleged offense of criminal contempt of court as to any defendant so charged, the government must prove each of the following elements beyond a reasonable doubt as to that defendant:
>
> 1. That the court entered an order, of reasonable specificity, to comply with a grand jury subpoena;
>
> 2. That the defendant had actual knowledge of the court order;
>
> 3. That the defendant disobeyed or disregarded the court order; and
>
> 4. That the defendant acted willfully and knowingly in disobeying or disregarding the court order.
>
> A court order binds parties to a case and those in active concert with parties who have actual knowledge of that order. Official officers of a business entity, as well as officers who for practical purposes are responsible for the conduct of the entity's affairs, are responsible for enabling the entity to comply with orders directed to it.

Rec. vol. I, doc. 9 at 16.

The defendants argue that by instructing the jury that a court order binds nonparties and that officers of an entity who "are responsible for the conduct of the entity's affairs, are responsible for enabling the entity

to comply with orders directed to it," the last paragraph of this instruction in effect relieved the jury from determining whether the order was reasonably specific in this case.

Although this portion of the district court's instruction did not itself delineate *Nilva*'s requirement of reasonable specificity, we are required to review the instructions *as a whole* in order to determine "not whether the charge was faultless in every particular, but whether the jury was misled in any way and whether it had understanding of the issues." *Durflinger*, 727 F.2d at 895. Viewed in this light, to the extent that this part of the instruction failed to accurately express the *Nilva* rule, we believe that the portion of the instruction requiring the jury to find that the order was reasonably specific "as to [each] defendant" compensated for any inaccuracy. Thus, the district court's instruction did not take this element away from the jury's consideration, and the court did not abuse its discretion by rejecting the defendants' proffered instruction.

### 2. *Mens Rea*

▅▅▅▅ The defendants also argue that the district court's instruction as to the requisite mens rea in this case was inadequate. As stated above, the court's contempt instruction required the jury to find "[t]hat the defendant acted willfully and knowingly in disobeying or disregarding the court order." Rec. vol. I, doc. 9 at 16. Additionally, the instruction defined the term "willfully" as follows:

> For purposes of the ... contempt offenses ... the term "willfully" means that the defendant performed an act, or failed to act, knowingly, voluntarily, deliberately and intentionally, as contrasted with accidentally, carelessly or unintentionally. The purpose of the "willfully" language, for purposes of the conspiracy and contempt charges, is to insure that a defendant will not be convicted for accidental, careless, or unintentional acts.

*Id.* at 17. The defendants argue that the instruction should have required the jury to find an intentional violation of a known legal duty and that the instruction given by the district court was in error because it only required proof that the defendants acted with the general intent to disobey the court order.

The government argues that the defendants did not raise this issue below and notes the rule that "[n]o party may assign as error the giving or the failure to give an instruction unless the party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection." Fed.R.Civ.P. 51; *see also* 10th Cir. R. 28.2(c)(stating that "if the appeal is based upon ... the giving or refusal to give a particular jury instruction," the parties must include in their initial briefs "a statement as to where a proper objection and the court's ruling thereon may be found in the record").

In their opening brief, the defendants do not indicate where in the record they objected to the district court's instructions regarding the element of intent. Similarly, in their reply brief, the defendants have not responded to the government's contention that they failed to object to the court's jury instruction. Although the defendants cite their own proffered instructions, they have not indicated a place in the record in which they objected to the court's instruction. We have also thoroughly reviewed the record in this case and agree that the defendants failed to object. Accordingly, we may only review the district court's instruction for plain error. *See United States v. Barber*, 39 F.3d 285, 287–88 (10th Cir.1994). Under this standard, we find no error in the district court's instruction regarding the requisite mens rea.

### 3. *Refusal to Instruct on Defendants' Theory of the Case*

▅▅▅ The defendants also argue that the district court erred by not instructing the jury regarding the defendants' theory of the case. They maintain that the court's failure to do so exacerbated the alleged errors it made regarding the previously mentioned jury instructions. According to the defendants, their proffered instruction regarding the elements of contempt should have been submitted to the jury to "inform the jury of the defendants' version of events and explain their theory of why their conduct did not

constitute criminal contempt." Br. of Aplts. Brent Beals and John Voss at 30. More specifically, the defendants argue that the court's failure to submit the proffered instruction "deprived the jury of the defendants' theory that they did not willfully violate the subject court orders." *Id.* at 30–31.

As we have already stated, however, we believe that, viewed as a whole, the district court's contempt instruction adequately explained the relevant legal standards to the jury regarding the necessary specificity of the court order. Additionally, to the extent the defendants argue that the district court erred in instructing the jury regarding the mens rea element of the offense, the defendants waived the issue.

*C. Sentencing Guideline for Contempt*

 The defendants argue that the district court applied the wrong sentencing guideline in this case. Section 2J1.1 of the United States Sentencing Guidelines (U.S.S.G.) governs sentencing for contempt convictions under 18 U.S.C. § 401(3). Section 2J1.1 merely states, "Apply § 2X5.1." U.S.S.G. § 2X5.1 instructs the court to apply "the most analogous offense guideline" if there is no guideline expressly applicable to the crime at issue. An Application Note to § 2J1.1 reads as follows:

> Because misconduct constituting contempt varies significantly ... the Commission has not provided a specific guideline for this offense. *In certain cases, the offense conduct will be sufficiently analogous to § 2J1.2 (Obstruction of Justice) for that guideline to apply.*

U.S.S.G. § 2J1.1 comment. (n.1) (Nov. 1987) (emphasis added). In this case the district court sentenced the defendants pursuant to U.S.S.G. § 2J1.2(b)(2), which governs cases involving the "Obstruction of Justice." Although we engage in de novo review of the district court's application and interpretation of the Guidelines, *United States v. McAlpine,* 32 F.3d 484, 487–88 (10th Cir.), *cert. denied,* ── U.S. ──, 115 S.Ct. 610, 130 L.Ed.2d 520 (1994), factual findings upon which the court based the sentencing determination are reviewed for clear error, *id.* at 488.

The defendants argue that the district court erred by sentencing them under § 2J1.2(b)(2), and that the "most analogous" guideline was really U.S.S.G. § 2J1.5, entitled "Failure to Appear by Material Witness." The defendants cite *United States v. Underwood,* 880 F.2d 612 (1st Cir.1989), as support for their position. In *Underwood,* the defendant was held in criminal contempt for refusing to testify at a trial. Because the district court had specifically found that the defendant did not intend to "obstruct justice," but instead intended only "not to testify," *see id.* at 620, the First Circuit held that § 2J1.2 was not the most analogous guideline. Instead, the court held, § 2J1.5 provided the closest analogy.

However, in *United States v. Remini,* 967 F.2d 754 (2d Cir.1992), the Second Circuit distinguished *Underwood* in the context of a case in which the district court specifically found that the defendant *had* attempted to obstruct justice by refusing to testify at a criminal trial. The *Remini* court reasoned that even though the defendants in both *Underwood* and *Remini* were held in contempt for refusal to testify, the district courts in each case had made sufficiently different findings to warrant application of the different "analogous" guidelines. *See id.* at 760.

In the instant case, the district court made the following finding prior to sentencing the defendants under § 2J1.2:

> The Court ... finds and concludes that the most closely analogous sentencing guideline is the guideline governing the obstruction of justice. It seems very clear to me that by refusing to comply with the Court's lawful orders even after having a civil contempt fine imposed, the defendants clearly were preventing the Grand Jury from getting records that most probably would have been of assistance to the Grand Jury in finding what actually occurred in this situation.

Rec. vol. XVI at 34. After reviewing the record, we cannot conclude that this factual finding is clearly erroneous. The district court was well aware of the facts of this case and carefully considered them in light of the Guidelines policies. In light of the district court's factual finding, we believe that the district court quite properly sentenced the

defendants under § 2J1.2, as this was the most analogous guideline under the circumstances of this case.

### D. Enhancement for Substantial Interference with Administration of Justice

██ Finally, the defendants argue that the district court erred in increasing the offense level from twelve to fifteen under U.S.S.G. § 2J1.2(b)(2).[3] The district court's decision raises factual questions that we review for clear error. *See McAlpine*, 32 F.3d at 488; *see also United States v. DeSalvo*, 26 F.3d 1216, 1224 (2d Cir.) (applying clearly erroneous standard of review to § 2J1.2(b)(2) enhancement), *cert. denied*, —— U.S. ——, 115 S.Ct. 192, 130 L.Ed.2d 124 (1994).

Section 2J1.2(b)(2) provides, "If the offense resulted in substantial interference with the administration of justice, increase by 3 levels." The commentary to § 2J1.2 states that "[s]ubstantial interference with the administration of justice includes a premature or improper termination of a felony investigation; an indictment, verdict or any judicial decision based on perjury, false testimony, or other false evidence; or the unnecessary expenditure of substantial governmental or court resources." U.S.S.G. § 2J1.2 comment. (n.1) (Nov. 1989).

In applying the three level enhancement to each of the defendant's sentences, the district court adopted the conclusion of the presentence reports that each "defendant's failure to produce subpoenaed records 'caused the government to expend substantial unnecessary time and effort in an attempt to determine the income of NCBA members' and 'effectively frustrated not only a criminal investigation of themselves and their activities, but also investigation of NCBA members.'" Rec. vol. XIX, ¶ 18; vol. XX, ¶ 11; vol. XXI, ¶ 18 (quoting Government's Sentencing Statement, Rec. vol. I, doc. 24 at 17–18). This conclusion regarding the § 2J1.2(b)(2) enhancement was largely based on the statements of IRS Special Agent Michael Herrera, who testified as follows concerning the failure to respond to the subject subpoenas and court orders:

Q: Were NCBA and NCE ordered by a Federal District Judge to provide records concerning their business activities?

A: [By Special Agent Herrera] Yes, they were.

Q: Did they provide those records?

A: No.

Q: Did the failure to provide those records in any way interfere with the ability of the IRS to do its job?

A: Yes they do [sic].

Q: Can you explain how?

A: If they don't provide records, then basically ... the only thing you could do is go to the banks and request all the bank records ... and analyze these records. It turned out that there were more than 15,000 documents contained in these bank records, and it took us approximately three years and approximately 4,000 hours to analyze everything and try to make sense of what was going on and try and identify the members and who made what money. Members still remain unidentified.

Rec. vol. X at 926–27.

The defendants now contend that the district court erred in relying on this testimony. They maintain that the subpoenaed records did not contain information that would have been useful to the government in its investigation. They note that the requested NCE files did not contain the names of members and "typically contained only receipts of the most recent transactions." Aplt. Mitchell Beals's Br. at 25.

We are not persuaded by the defendants' argument. As the government observes, trial testimony indicated that the NCBA and the NCE maintained records of recent transactions and that the names of individual members could be obtained when needed. *See* Rec. vol. VII at 430–34. In light of this evidence, it was not clearly erroneous for the district court to rely on Special Agent Herrera's testimony to conclude that these records would have been helpful to the government's investigation and that the failure to produce them resulted in the unnecessary expenditure of governmental resources.

---

**3.** After increasing the defendant Brent Beals's offense level from twelve to fifteen, the court granted a two level reduction because of his minor role in the offense. *See* Rec. vol. XVII at 14.

Moreover, we note that under the commentary to § 2J1.2(b)(2) "substantial interference with the administration of justice" includes "the unnecessary expenditure of . . . *court* resources." *See* USSG § 2J1.2(b)(2) comment. (n.1) (Nov. 1989) (emphasis added). The record supports the conclusion that the defendants' initial failure to respond to the subpoenas resulted in the issuance of additional subpoenas, the conducting of additional court proceedings, and the issuance of court orders requiring production of the subject documents. If the defendants had complied with the subpoenas after the initial motion to quash was denied, the subsequent subpoenas and court orders, and many of the subsequent court proceedings (and the resulting expenditure of court resources) would not have been necessary.

Accordingly, we conclude that the district court did not err in imposing a three-level increase in the defendants' offense levels under U.S.S.G. § 2J1.2(b)(2).

### III. CONCLUSION

The judgment of the district court is accordingly AFFIRMED in all respects.